[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2010
JOHN LEY
ACTING CLERK

No. 08-16587
Non-Argument Calendar
_____

D. C. Docket No. 07-01947-CV-ODE-1

JEFF GOOLSBY,

Plaintiff-Counter-
Defendant-Appellant,

versus

GAIN TECHNOLOGIES, INC.,
MIKE LADNEY, President, Individually,
EDWARD C. SMITH, Vice President, Individually,
JIM TEASDALE, CFO, Individually,

Defendants-Counter-
Claimants-Appellees,

PLASTIC MOLDED TECHNOLOGIES, INC.,
d.b.a. Gain Technologies, Inc.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 21, 2010)

Before TJOFLAT, HULL and WILSON, Circuit Judges.

PER CURIAM:

Plaintiff Jeff Goolsby, who proceeds pro se, sued the Defendants for negligence in connection with their design and construction of a steel mold intended to be used for the manufacture of after-market rearview mirrors for automobiles, for which Goolsby holds a patent. Goolsby appeals the district court's grant of summary judgment in favor of the Defendants and denials of his motions to amend his complaint. After review, we affirm.

## I. BACKGROUND

The rather convoluted factual and procedural history of this case requires that we give a full background explanation before analyzing the issues on appeal.

### A. The Parties

Plaintiff Goolsby is the record inventor and owner of U.S. Patent No. 6,270,225 B1, titled "Blind Spot Sideview Mirrors." The patent covers a three-plane side-view mirror for use on automobiles and is intended to "provide an adequate display of vehicles in the regular view area, the overtaking area, and the blind spot area in one single contiguous mirror."

The Defendants are (1) Plastic Molded Technologies, Inc., d/b/a Gain Technologies, Inc. ("Gain"), (2) Mike Ladney, Gain's President, (3) Edward

Smith, Gain's Vice President, and (4) Jim Teasdale, Gain's Chief Financial

Officer. Gain is a manufacturer of plastic products using a "gas assist injection"

system.

**B.      2003-2004**

In June 2003, Goolsby contacted Gain by letter, stating, "I saw your website

and would like to get you to build some plastic mirrors for us." Goolsby requested

that the mirrors be made of "Exterior Automotive Grade ABS plastic." A chromed

mirrored finish and adhesive then would be applied to the plastic mirrors.

Goolsby and Gain negotiated the terms of a production agreement

throughout 2003 and 2004. On May 27, 2004, Defendant Vice President Smith

sent Goolsby a revised proposal for the mirror production contract, for the first

time proposing use of a "1-2 Cavity P20 Steel Production Family Injection Mold

(Base substrate with mirror finish on cavity)." The cost for manufacturing this

proposed 1-2 cavity P20 mold was $27,900.00. Goolsby later testified that he had

no role in Gain's alleged decision to use P20 steel in creating the injection mold.[1]

On July 27, 2004, Defendant Smith again sent Gain's proposal to Goolsby.

The July 27, 2004 proposal states: "The mirror includes a base substrate made with

---

[1]The record does not clarify exactly what "P20" steel is or how it differs from stainless steel. In an affidavit, Defendant Smith averred that, "P20 steel is commonly used to make molds for products on which a mirror finish is to be applied. GAIN used P20 steel for Mr. Goolsby's mold in accordance with industry standards and practices."

3

platable grade ABS. The substrate will then be sent out to be first surface chrome plated. The parts will be returned to GAIN Technologies, inspected and approximately 6 square inches of a peel and stick adhesive tape added to the back for applying the aftermarket mirror to current OEM mirror." The July 27, 2004 proposal listed as "Production Option 2" a "Primary Tooling" of "1-4 Cavity P20 Steel Production Family Injection Mold (Base substrate with mirror finish on cavity)" at a cost of $39,800. The proposal listed the "Total Tooling Cost" for Production Option 2 as $59,600. Gain proposed to begin production within "10 weeks to first shots from receipt [of] purchase order, full math data and 50% tooling deposit."

On August 27, 2004, Goolsby sent to Defendant Smith at Gain four checks totaling $29,800, all drawn as cash advances on Goolsby's credit cards, representing half the total tooling cost of Gain's proposal as the deposit for Gain to build the molds necessary to produce the mirror.

On September 14, 2004, Goolsby sent back a signed acceptance to Gain of its July 27, 2004 proposal, including the use of "Production Option 2" and a four-cavity P20 steel production family injection mold.

C.     2005-2007

It is undisputed that Gain experienced difficulties in manufacturing a mirror

4

to meet Goolsby's requirements. Correspondence between Goolsby and individuals at Gain in 2004 and 2005 illustrated several quality issues that arose during the production process.

On August 10, 2005, Jim Byrd, Gain's Vice President and General Manager, sent an email to Defendant Smith at Gain, stating:

> I have attempted to do everything in our power and expertise to perfect the mirror for Mr. Goolsby, I have come to the conclusion we have no more option [sic] to explore, every time we send him parts, he changes his thoughts so many different directions it is very difficult to understand what it is he wants. The gold mirror in which [sic] we sent him is the best of the best. He liked the appearance but as you can see by his e mail again we go off on different tangents. What is the solution? ANY THOUGHTS.

On March 23, 2006, Defendant Smith sent Goolsby a letter describing the history of Gain's production attempts and the various quality-control issues that arose during production. Gain offered to reproduce the mirror molds in "420 stainless steel with a Rockwell [hardness] of 48-52 and then nickel plate the mold once we have approved parts. Both of these are engineering changes. I have verbally quoted the stainless steel pricing and can provide a hard quote for these changes if you desire. The additional research and development have been done for you at absolutely no cost to you."

Gain eventually created a single-cavity mold out of stainless steel. Goolsby

5

rejected the mirror produced using this stainless steel mold as well, contending the final product was insufficient. Goolsby asserted this error arose because Gain polished the stainless steel mold to the point it was a "concave" surface no longer fit for producing a flat optical quality mirror. But Goolsby admits he never examined the mold itself.

On March 23, 2006, Goolsby sent a letter to Eric Kirkland, Engineering Manager of Caprock Manufacturing in Lubbock, Texas. Goolsby included some of the exterior mirrors manufactured by Gain. Goolsby explained his concerns with Gain's manufacturing process: "They [Gain] used P20 steel on the mirror plates in the mold and they have not been able to remove the orange peel appearance." Goolsby sought a quote from Kirkland to make the mirrors, stating, "If they [Gain] do not make the new mirror plates with suitable metal and start making marketable mirrors in two weeks from last Monday, I will need to make a change."

In further correspondence, Goolsby informed Kirkland that he had discussed his mirrors with "numerous experts" in optical finish and was told it would be impossible to make an optical finish on the mirrors using P20 steel and that stainless steel could produce an optical finish if correctly honed and polished. Kirkland responded, "You're correct. The cavity plates should be stainless, and

6

should be polished to a mirror finish."

On April 21, 2006, Goolsby sent a letter to Defendants President Ladney and Vice President Smith detailing his impressions of Gain's mistakes in attempting to produce the mirrors and threatening to file a lawsuit. Goolsby stated:

> Clearly, you are encouraging me to file a lawsuit against you, Mike Ladney, and Gain Technologies. [sic] Inc., since you have failed to respond to my compromise offer to use some of my profits from my mirror sales to help you pay for your "Errors and Omissions" mistake of recommending, quoting, and ordering the wrong steel (P20 steel) to be used in making the mold to produce my exterior rearview mirrors, including the optical finish, plus wasting at least fifteen (15) months attempting to resolve the problems caused by your incorrect steel mold mistake.
> . . . .
> You and I both know now that had [sic] you should have ordered Stainless Steel to be used in making the plates for the mirror surface.

Throughout 2006 and 2007, Goolsby sent other letters to Gain explaining his contentions that Gain breached legal duties to him through its alleged negligent selection of P20 steel: "The legal term for the mold failure is that anyone representing themselves as experts in the mold manufacturing business 'either knew or should have known that stainless steel was necessary for an optical quality finish.' It was the required duty of the mold maker to not accept the job without requiring stainless steel be used for the required optical quality plates."

7

## D.    Goolsby's Complaint

On July 13, 2007, Goolsby, proceeding pro se, filed this action for "tort damages" in the State Court of Henry County, Georgia. Goolsby alleged the Defendants damaged him through their (1) "failure to fulfill their implied duties," (2) "errors and omissions," (3) "gross negligence," (4) "lack of due diligence," and (5) "inadequate management and supervision," in their failure to manufacture Goolsby's mirrors within the proposed timeline and to Goolsby's specifications. Goolsby continued: "One major error was recommending, specifying, and ordering the optical plates portion of the mold made with P20 steel because plaintiff has later learned from other mold makers that P20 steel is too porous and can not possibly produce an optical quality finish."

Goolsby alleges Gain's actions caused him to lose $5,400,000 in profits plus $20,862.75 in interest in the amounts Goolsby borrowed to finance his initial deposit to Gain.

The Defendants removed the action to the district court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).[2] Defendant Gain also asserted a counterclaim against Goolsby for money allegedly still owed by Goolsby under his

---

[2]Goolsby resides in Rex, Georgia. Gain is a Michigan corporation with its principal place of business in Shelby Township, Michigan. Defendants Ladney, Smith, and Teasdale reside in Michigan. Goolsby sought remand, which the district court denied.

8

contract for creation of the mold.

On October 29, 2007, Goolsby moved to amend his complaint to correct the name of Defendant Gain to "Plastic Molded Technologies, Inc. d/b/a Gain Technologies, Inc.," which was granted by the district court.

**E.      Discovery And Goolsby's Amendments**

On November 14, 2007, the parties filed a Joint Preliminary Report and Discovery Plan agreeing that discovery would be limited to four months and would expire on February 8, 2008, which Plan the district court approved as its Scheduling Order.  The parties also agreed amendments to the pleadings could not be submitted after thirty days following the (November 14, 2007) filing of the Joint Preliminary Report and Discovery Plan, "unless otherwise permitted by law."  This meant amendments to the complaint had to be filed by Friday, December 14, 2007.

On February 11, 2008, three days <u>after</u> the discovery period lapsed, Goolsby filed a motion to extend the discovery period, stating that he recently obtained evidence requiring an extension of discovery and amendments to his complaint. The district court denied Goolsby's motion as untimely because of the "simple nature of this action, the fact that the parties had four months in which to conduct discovery and the absence of good cause warranting an extension."[3]

--------

[3]Goolsby filed a motion for reconsideration of the district court's denial of his motion to extend the discovery period.  Goolsby argued he delivered his discovery extension motion to the

9

Also on February 11, 2008, nearly two months <u>after</u> the parties' deadline for amending the pleadings, Goolsby moved to amend his "Complaint For Tort Damages," seeking to add "an additional charge for a refund of the earnest money deposit that Plaintiff paid to Gain . . . ."

## F.    Summary Judgment Motions And Goolsby's Additional Amendments

On March 10, 2008, the Defendants moved for summary judgment. The Defendants argued Goolsby had not shown any evidence to support his claims against Defendants President Ladney and CFO Teasdale. The Defendants also argued Goolsby could not succeed on his claims against Defendants Gain and Vice President Smith for negligence because Goolsby failed to identify any expert testimony that would support his claim that Gain's recommendation to use P20 steel did not meet a reasonable standard of care.

On March 27, 2008, Goolsby responded to the Defendants' summary judgment motion but did not contest the substance of the motion or any of Defendants' asserted undisputed material facts.

On June 2, 2008, Goolsby again moved to amend his "Complaint for Tort

---

district court Clerk's Office on February 6, 2008, two days before the end of the discovery period. The district court denied Goolsby's motion for reconsideration as well. Regarding Goolsby's argument about the filing date of his discovery extension motion, the district court stated: "This is incorrect; the Clerk's time-stamp clearly reads 'February 11, 2008.'" Our examination of Goolsby's motion for extension, including the time-stamp affixed by the district court Clerk's Office, confirms this assessment.

Damages," to include Jim Byrd, allegedly Vice President and General Manager of Gain, as a defendant. Goolsby alleged Byrd "was one of the major causes of Defendants' failure to produce a mold that could manufacture Plaintiff's mirrors . . . ." On June 4, 2008, Goolsby filed a fourth motion to amend his complaint, adding specific factual allegations against Byrd and amending his plea for damages on the basis that the Defendants failed to respond to his request for a second settlement conference. On June 25, 2008, Goolsby filed a fifth motion to amend his complaint to "add CAD file manipulation damages to complaint for tort damages" because "manipulation of the Cad [sic] file that appeared to be sabotage and caused the necessity of remaking Plaintiff's mirror mold by Kender Mould Engineers."

On June 25, 2008, Goolsby filed a motion for summary judgment. Goolsby's summary judgment motion included evidence from two individuals Goolsby contends are experts in making molds for plastic mirrors. Regarding the first individual, Eric Kirkland of Caprock Manufacturing, Goolsby submitted unverified emails in which Kirkland stated his belief that the mold cavity plates for making Goolsby's mirrors should be made from stainless steel. The second individual, Kwan Sik Kong, General Manager of Kender Mould Engineering Co.

in Hong Kong, China,[4] submitted an affidavit averring that microscopic "orange peel" defects on the sample mirrors he had examined produced by Gain were caused by use of the "wrong type of mould [sic] base steel (P20) . . . ." Kong also averred that his company could make satisfactory molds for Goolsby's invention through use of "a much higher density Steel mould base," such as S136 steel from Sweden. Goolsby's summary judgment motion did not include descriptions of the qualifications of either of these two individuals as experts.

**G.      District Court's Order And Goolsby's Reconsideration Motion**

On July 14, 2008, the district court entered an order denying Goolsby's remaining four motions to amend his complaint, denying Goolsby's motion for summary judgment, and granting the Defendants' motion for summary judgment.

On July 23, 2008, Goolsby filed a motion for reconsideration of the district court's grant of summary judgment to the Defendants. Goolsby reiterated his claim that Kirkland and Kong qualified as experts and had presented sufficient expert evidence to rebut the Defendants' undisputed facts on summary judgment. However, Goolsby did not file any additional materials detailing Kirkland's or Kong's qualifications as experts or otherwise describing how they would testify at

---

[4]Kong's affidavit appears to be signed by Berry Yaneza, who is listed in the signature block and the first sentence of the affidavit. Goolsby later clarified that Yaneza, the Sales Manger for Kender, handled the affidavit and submitted it to the district court on behalf of his boss, Kong. For the purposes of this opinion only, we assume the affidavit was filed by Kong.

12

trial. Goolsby also stated his lack of personal knowledge regarding the decision to use P20 steel as opposed to stainless steel: "Plaintiff had no knowledge or involvement in decisions regarding material to use or how to build any of the manufacturing equipment no more than the Court would know which brand of spark plugs should be used in the Court's next new car."

Goolsby also filed two affidavits averring that he hand-delivered his discovery extension motion to the district court Clerk's Office on February 6, 2008 (two days before discovery ended) but that the Clerk's Office failed to file the motion until the following Monday, February 11, 2008.

The Defendants responded that Goolsby's reconsideration motion was another attempt to re-litigate issues already decided by the district court in its previous orders. The Defendants argued that Goolsby's characterizations of Messrs. Kirkland and Kong as experts failed because he had not filed expert reports, had not submitted original affidavits, and had not identified his experts before the close of discovery, as required by Fed. R. Civ. P. 26 and Northern District of Georgia Local Rules 26.2 and 56.1.

Goolsby filed an extensive reply in support of his reconsideration motion, arguing, among other things, that he was not required to identify expert witnesses because Defendant Smith "admitted that Stainless [steel] was mandatory to

13

adequately remove orange peel on March 23, 2006," citing a March 23, 2006 letter from Smith to Goolsby. In the letter, Smith states:

> As you are aware, in an ongoing effort to get the best possible finish on the first surface of the cavities, I had them benched three different times . . . . The end result is that we now believe the best possible answer is to reproduce the cavities in a 420 stainless steel with a Rockwell of 48-52 and then nickel plate the mold once we have approved parts. Both of these are engineering changes. I have verbally quoted the stainless steel pricing and can provide a hard quote for these changes if you desire. The additional research and development have been done for you at absolutely no cost to you.

Goolsby also, for the first time, filed brief descriptions of the professional qualifications for Messrs. Kirkland and Kong.

On October 20, 2008, the district court denied Goolsby's reconsideration motion. In response, Goolsby filed a motion to "re-reconsider" the district court's summary judgment order and to rectify the district court's "violations of law and apparent vendetta against pro se litigants."

On December 5, 2008, the district court denied Goolsby's motion to "re-reconsider" the district court's grant of summary judgment to the Defendants.[5]

## H.    Appellate Proceedings

On November 19, 2008, Goolsby filed a notice of appeal of the district

---

[5]On November 14, 2008, Defendant Gain filed a motion to dismiss its counterclaim against Goolsby without prejudice, which the district court granted on December 5, 2008.

14

court's orders denying his motion for summary judgment and denying reconsideration of that order. On January 16, 2009, this Court dismissed Goolsby's initial appeal for lack of jurisdiction because, at the time the appeal was filed, the district court's judgment was not "final or immediately appealable" because Defendant Gain's counterclaim remained pending. The district court then dismissed Gain's remaining counterclaim. On April 8, 2009, this Court reinstated Goolsby's appeal.[6]

## II. DISCUSSION

### A. Goolsby's Arguments On Appeal

Appellant Goolsby's initial brief, filed on April 27, 2009, contains 13 enumerations of error. On November 3, 2009, Goolsby filed an amended brief and motion "to file corrected brief to include standard of reviews [sic] and corrected pro se errors."[7] Goolsby's amended brief purports to raise 10 issues, which although overlapping substantially with what Goolsby argued initially, are completely reworded.[8]

---

[6]On April 29, 2009, this Court again dismissed Goolsby's appeal, pursuant to 11th Cir. R. 42-3(c), for want of prosecution because Goolsby failed to file a corrected appellant's brief within the time fixed by the rules. On June 4, 2009, this Court reinstated Goolsby's appeal.

[7]On December 30, 2009, the Court granted Goolsby's motion to file an amended brief.

[8]Rule 28 of the Federal Rules of Appellate Procedure requires an appellant's brief to contain the appellant's argument(s), which must contain the appellant's contentions of error, and, for each issue, a statement of the standard of review and citations to authorities and portions of

15

We liberally construe Goolsby's amended brief to argue these six issues: (1) the district court erred in denying Goolsby's motions to amend the complaint; (2) the district court erred in granting summary judgment to the Defendants and denying Goolsby's motion for summary judgment; (3) the district court erred by not addressing Gain's alleged breach of its contract with Leasing Capital Partners, Inc.; (4) the district court improperly "suppressed" evidence supporting Goolsby's claims; (5) the district court improperly "refused to accept" electronic records; and (6) the district court and the Defendants' counsel committed misconduct. After review, we conclude all six issues have no merit and only the first two warrant further discussion.

## B.     Motions To Amend The Complaint

Federal Rule of Civil Procedure 15 provides a party may amend a pleading once as a matter of course before being served with a responsive pleading. Fed. R. Civ. P. 15(a)(1)(A) (2007).[9]  A party otherwise may amend its pleading only with

the record supporting the appellant's arguments. Fed. R. App. P. 28(a)(9). Goolsby is proceeding pro se, and we construe pro se filings liberally and hold pro se litigants to a less-stringent standard than those represented by counsel. Boxer X v. Harris, 437 F.3d 1107, 1110 (11th Cir. 2006). Yet even with the leniency afforded to pro se litigants, a court should not serve as de facto counsel to a pro se party and rewrite otherwise deficient arguments, GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998), and issues not briefed by a pro se litigant on appeal are deemed abandoned. Horsley v. Feldt, 304 F.3d 1125, 1131 n.1 (11th Cir. 2002).

[9]Effective December 1, 2009, Rule 15 was amended to alter the time limits and requirements for amended pleadings. In this Opinion, we quote from the previous version of the Federal Rules of Civil Procedure that applied when Goolsby filed his proposed amendments to

the opposing party's written consent or the court's leave, which should freely be granted if justice so requires. Id. 15(a)(2).[10] A district court ordinarily should grant motions to amend a complaint unless the movant's conduct demonstrates "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies . . . , undue prejudice to the opposing party . . . , [or] futility of the amendment . . . ." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); accord Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1262-63 (11th Cir. 2004) (concluding district court may properly deny untimely amendment if the amendment would be futile).

The district court is required to enter a scheduling order, which limits the time "to join other parties and to amend the pleadings." Fed. R. Civ. P. 16(b)(1) (2007). "A schedule may be modified only for good cause and with the judge's consent." Id. 16(b)(4). The good cause standard for modification of a scheduling order "precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (quotation marks omitted). In cases where a plaintiff seeks leave to amend the complaint outside of deadlines set in the scheduling

the complaint.

[10]We review a district court's refusal to grant a motion to amend the pleadings for abuse of discretion. Diesel "Repower", Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1321 (11th Cir. 2001).

order, the plaintiff must show "good cause" for the district court to modify its order and allow the amendment.  Id. at 1419.

As discussed above, the parties' Scheduling Order provided amendments to the pleadings would not be filed after December 14, 2007 (thirty days from November 14, 2007), "unless otherwise permitted by law."  Goolsby filed amendments to his complaint – on February 11, June 2, June 4, and June 25, 2008 – all well outside the time for amendments fixed by the Scheduling Order.  Thus Goolsby must show "good cause" to justify the amendments.

After full review, we conclude the district court did not abuse its discretion in refusing to allow the amendments.[11]  More specifically, the district court did not abuse its discretion in concluding that Goolsby did not give good cause for his failure to add additional claims, factual allegations, and an additional party[12] at an earlier date.

---

[11]Construed liberally, Goolsby's appeal brief argues the district court also erred in denying his motion to extend the discovery period.  Matters pertaining to discovery are committed to the sound discretion of the district court, which we review for abuse of discretion.  Patterson v. U.S. Postal Serv., 901 F.2d 927, 929 (11th Cir. 1990).  "The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."  United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989).  We see no abuse of discretion in the district court's determination that Goolsby's motion to extend the discovery period was untimely or the district court's denial of Goolsby's motion to extend the discovery period.

[12]Goolsby listed Byrd as a Defendant-Appellee in this case, but, as the district court properly denied Goolsby's request to make Byrd a party to this case, we do not consider him an Appellee in this appeal.

18

## C.     Summary Judgment Motions

The district court granted summary judgment to the Defendants on two separate grounds. First, the district court granted summary judgment to Defendants President Ladney and CFO Teasdale because Goolsby had not shown evidence that these two corporate officers were involved in the alleged negligence, other than through their general status as officers of Gain. The district court granted summary judgment to Defendants Gain and Vice President Smith because it determined Goolsby was required to present expert testimony supporting his claim of Gain's negligent use of P20 steel, which he failed to do. After review, we affirm on both grounds.[13]

### 1.     Defendants President Ladney and CFO Teasdale

Goolsby sued the Defendants for their "failure to fulfill their implied duties," "errors and omissions," "gross negligence," "lack of due diligence," and "inadequate management and supervision." These claims all rely on a negligence

---

[13]This Court reviews a district court's grant or denial of summary judgment de novo. Brinson v. Raytheon Co., 571 F.3d 1348, 1350 (11th Cir. 2009). Summary judgment is appropriate when the pleadings, discovery and disclosure materials on file, and any affidavits, when viewed in the light most favorable to the nonmoving party, present no genuine issue as to any material fact and show that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Holloman v. Mail-Well Corp., 443 F.3d 832, 836-37 (11th Cir. 2006). "For issues . . . on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim . . . . Instead, the moving party simply may show . . . that there is an absence of evidence to support the non-moving party's case." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (internal quotation marks and emphasis omitted).

theory.[14] To state a cause of action for negligence in Georgia,[15] the plaintiff must show (1) a legal duty to conform to a standard of conduct; (2) a breach of this standard; (3) a causal connection between the conduct and the resulting injury; and (4) some loss or damage to the plaintiff's legally protected interest. City of Douglasville v. Queen, 514 S.E.2d 195, 197 (Ga. 1999).[16]

Goolsby asserts claims for negligence against Defendants President Ladney and CFO Teasdale, both individually, based on their status as corporate officers of Gain. Under Georgia law, a corporation such as Gain is a separate and distinct legal entity from its officers and is held vicariously liable for the torts of its officers that are committed in the prosecution of and within the scope of the corporation's business. Smith v. Hawks, 355 S.E.2d 669, 675 (Ga. Ct. App. 1987) (citing O.C.G.A. § 51-2-2). "As a general rule, however, one who merely occupies the capacity of a corporate officer cannot be held to be vicariously liable for such damages as would otherwise be recoverable from his corporate principal." Id.

---

[14]Plaintiff repeatedly confirmed that he seeks "tort damages" in this action and is not suing for breach of contract.

[15]A federal court exercising diversity jurisdiction applies the substantive law of the state in which the case arose. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996).

[16]This Court analyzes this case through the lens of a negligence claim because that is the claim Goolsby asserts and the manner in which the parties and the district court litigated the case. See Marsh v. Butler County, Ala., 268 F.3d 1014, 1023 n.4 (11th Cir. 2001) (en banc) (construing complaint in the manner litigated by the parties and district court).

"'[A]n officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or co-operated therein.'" Mitcham v. Blalock, 447 S.E.2d 83, 88 (Ga. Ct. App. 1994) (quoting Lincoln Land Co. v. Palfery, 203 S.E.2d 597, 603 (Ga. Ct. App. 1973)). It follows that Defendant President Ladney and CFO Teasdale cannot be individually liable for negligence unless Goolsby can show some evidence connecting them specifically to the negligence alleged in this case.

Goolsby has not shown any evidence connecting either Defendant President Ladney or Defendant CFO Teasdale to the conduct that forms the basis of his claims. The gravamen of Goolsby's claim is that Gain, through the actions of the individual Defendants, negligently recommended P20 steel for the mold used to manufacture his patented rearview mirrors. In his deposition, Goolsby asserted that Gain and the individual Defendants "did not do enough research to determine what kind of material the plates should be made out of," that they recommended the use of P20 steel, and that this conduct was "negligence because they should have researched it sufficiently to determine what they should have been recommending."

However, when asked specifically about Defendant President Ladney,

21

Goolsby admitted that he has never spoken with Ladney:

> Q. Had you had any discussions by the time Exhibit Number 12 was created and this mention of P20 steel occurred with Mr. Ladney?
> [Goolsby]. With who?
> Q. Mike Ladney.
> [Goolsby]. I never had any conversation with him at all.
> Q. You never have spoken with him?
> [Goolsby]. Not one word.

Goolsby testified similarly regarding Defendant CFO Teasdale, stating that he did not believe Teasdale was involved in, or even knew of the reasons supporting, Gain's recommendation to use P20 steel, and that he had not discussed the use of P20 steel with Teasdale:

> Q. Did you ever have any discussion with Mr. Teasdale about the use of P20 steel as the material out of which the mold was created?
> [Goolsby]. I don't imagine he knows anything about it. He's the financial officer. He's the CFO.
> Q. You don't have any reason to believe that he's the one who made the decision to use P20 steel?
> [Goolsby]. No. He – well, I don't know because I don't know the different in price other than somebody told me that it was only about $2 a pound more than – I mean stainless steel was about $2 a pound more than P20 steel, and it wasn't going to be that many pounds of material used, so it was a negligible thing.
> Q. So the answer to my question is you have no information that would lead you to believe that Mr. Teasdale had any input in the decision to use P20 steel for the mold?
> [Goolsby]. Other than the fact that he wouldn't – he wouldn't release any money to go with stainless steel

22

until after I –

Nor do the various documents and communications Goolsby relies on implicate Defendants President Ladney or CFO Teasdale in Gain's recommendation to use P20 steel.[17]  None of the documents in the record show any communication whatsoever from Defendant Ladney to Goolsby.  And the only documents that purport to implicate Defendant Teasdale are communications from Goolsby to Defendants Smith, Ladney, and Teasdale in 2006 and 2007 accusing them generally of negligence in Gain's performance under its obligations to Goolsby, and one email, dated October 4, 2006, from Defendant Teasdale to Defendant Smith, discussing Teasdale's discussions with Goolsby about splitting the cost of charges for the mold.  None of these documents indicates Defendant Teasdale had any role in the recommendation to use P20 steel to make Goolsby's mirrors, which is the only factual allegation supporting Goolsby's claim in this case.  At best, this evidence shows Teasdale was aware of financial matters involving Goolsby's mirror project over two years after Gain allegedly made the

---

[17]In his motion for summary judgment, Goolsby speculates that "**Jim Teasdale, CFO**, withheld funding of the order for the stainless steel mold plate . . . from March 20, 2006 until either September 15, 2006 or likely near the middle of November, 2006 . . . . This is a partial assumption because Defendant Smith promised on March 20, 2006 to have the mold plate made using stainless steel . . . but did not issue its purchase order until November 13, 2006 . . . . Obviously, Defendant Teasdale must have been withholding the necessary funds."  The evidence in the record does not support this speculation or Goolsby's broader contention that Defendant CFO Teasdale was involved in the decision to recommend use of P20 steel.

negligent recommendation to use P20 steel. This is not enough to create a genuine issue of material fact.

Accordingly, the district court did not err in granting summary judgment to Defendants Ladney and Teasdale because Goolsby has not shown any evidence supporting their direct participation in the negligent acts he alleges in this case.

## 2. Defendants Gain And Vice President Smith

Goolsby's claim against Defendants Gain and Vice President Smith likewise is based entirely on a negligence theory and the assertion that the recommendation to use P20 steel fell below the required standard of care. The district court granted summary judgment to Defendants Gain and Vice President Smith because Goolsby failed to present expert witness evidence in support of his allegation that use of P20 steel in this context was negligent.

We agree with the district court that Goolsby was required to present expert testimony in this case. Under Georgia law, "[u]nless no other conclusion is permissible, questions of negligence are matters for jury resolution . . . ." Johnson v. Crews, 299 S.E.2d 99, 100 (Ga. Ct. App. 1983) (internal quotation omitted). Jurors are the ultimate triers of fact, and "where it is possible for them to take the same elements and constituent factors which guide [an] expert to his conclusions and from them alone make an equally intelligent judgment of their own,

24

independently of the opinion of others, then undoubtedly this should be done."

Metro. Life Ins. Co. v. Saul, 5 S.E.2d 214, 221 (Ga. 1939).

"However, '[e]xpert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman.'" Baise v. State, 502 S.E.2d 492, 496 (Ga. Ct. App. 1998) (quoting Smith v. State, 277 S.E.2d 678, 683 (Ga. 1981)). Expert testimony is required in cases of professional negligence where the subject matter is beyond the familiarity of the average layperson. See Marquis Towers, Inc. v. Highland Gp., 593 S.E.2d 903, 906 (Ga. Ct. App. 2004) (negligence of professional consultant); Dep't of Transp. v. Mikell, 493 S.E.2d 219, 223 (Ga. Ct. App. 1997) (negligence of traffic engineers); H. Elton Thompson & Assocs., P.C. v. Williams, 298 S.E.2d 539, 540 (Ga. Ct. App. 1982) ("Expert testimony is required because the court and jury are not permitted to speculate as to the standard against which to measure the acts of the professional in determining whether he exercised a reasonable degree of care.") (negligence of architect and contractor).[18]

---

[18]In granting summary judgment in favor of the Defendants, the district court relied in part on Georgia's professional malpractice statute, O.C.G.A. § 9-11-9.1, which requires a plaintiff alleging professional negligence to file, contemporaneous with the complaint, an expert affidavit specifically averring "at least one negligent act or omission claimed to exist and the

The gravamen of Goolsby's negligence claim is that Gain's use of P20 steel to fabricate a mold for gas-assisted injection molding fell below the required standard of care in this particular industry. That technical question is beyond the expertise of an ordinary juror, and Goolsby was required to identify expert evidence to prove negligence in this case. In his deposition, Goolsby was asked whether he had "any specific training or experience or knowledge that would allow [him] to draw a conclusion about what steel is appropriate for creating a mold for [the mirrors at issue in this case]." Goolsby responded that he did not have any academic knowledge other than what was told to him by third parties. The record does not contain any expert description of the physical differences and salient properties between P20 and stainless steel, certainly not enough for the average lay juror to be able to evaluate whether the use of P20 steel in this fabrication context was professionally negligent.

factual basis for each such claim." Id. While we acknowledge O.C.G.A. § 9-11-9.1 properly may be applied to the engineering profession, see Adams v. Coweta County, 430 S.E.2d 599, 601 (Ga. Ct. App. 1993), the 1997 amendments to § 9-11-9.1 narrowed the section's application to specific groups of professionals officially licensed by the State of Georgia. Minnix v. Dept. of Transp., 533 S.E.2d 75, 78-79 (Ga. 2000). Section 9-11-9.1 currently applies to "[p]rofessional engineers" that are "licensed by the State of Georgia." O.C.G.A. § 9-11-9.1(a)(1), (g)(21); accord Dockens v. Runkle Consulting, Inc., 648 S.E.2d 80, 82 (Ga. Ct. App. 2007) (applying O.C.G.A. § 9-11-9.1 to claim against "licensed professional engineer"). Gain and the individual Defendants all reside in Michigan. Goolsby does not allege, and the Defendants do not state in their filings in the district court or on appeal, that any of the Defendants are professional engineers licensed by the State of Georgia such that § 9-11-9.1 would apply in this case.

Goolsby argues expert testimony is not required in this case because Defendant Vice President Smith admitted to professional negligence. To support this argument, Goolsby relies on the letter from Defendant Smith, dated March 23, 2006, in which Smith states in part: "The end result is that we now believe the best possible answer is to reproduce the cavities in a 420 stainless steel with a Rockwell [hardness] of 48-52 and then nickel plate the mold once we have approved parts. Both of these are engineering changes."

This communication from Defendant Smith does not establish negligence and excuse Goolsby from his obligation to produce expert testimony. At best, it establishes Smith and Goolsby both believed as of March 2006, nearly two years into the contract, that stainless steel may have been a better engineering choice to manufacture the mirrors (although subsequent evidence shows that even when using stainless steel, Gain was unable to meet Goolsby's specifications). Goolsby claims Gain was negligent in its initial recommendation to use P20 steel. The fact that two years later, after several attempts to meet Goolsby's specifications, Defendant Smith admitted that an engineering change might improve matters does not establish negligence without some expert evidence showing Gain's original recommendation was professionally negligent.

Goolsby also argues that, if expert testimony is required, he satisfied these

27

requirements through the affidavits and supporting documentation of Eric Kirkland and Kwan Sik Kong. Our review shows Goolsby failed to follow the requirements of the Federal Rules of Civil Procedure and the U.S. District Court for the Northern District of Georgia's Local Rules, and the district court properly concluded Goolsby had failed to submit expert evidence.[19]

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose "the identity of any witness it may use at trial to present" expert testimony at the time it files its initial disclosure, which are due within 14 days after the parties' Rule 26(f) conference. Fed. R. Civ. P. 26(a)(1)(C), (a)(2). The district court docket does not reflect that Goolsby filed initial disclosures. On December 29, 2007, however, Goolsby filed responses to the Defendants' interrogatories, in which he stated: "There are no plans at this time to call experts, but will [sic] call experts if Defendants plan to use experts." The Northern District of Georgia's Local Rules additionally require that any designations of experts shall occur during the discovery period and that failure to identify expert witnesses in a timely manner prohibits the use of experts at trial. N.D. Ga. R. 26.2C.[20]

---

[19]We review a district court's rulings on the admissibility of expert testimony for abuse of discretion. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999).

[20]"Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be

28

Goolsby's identification of experts occurred well outside these time periods. Even construed liberally, Goolsby did not identify Kirkland and Kong as proposed experts until he filed his summary judgment motion on June 25, 2008, over four months after discovery closed on February 8, 2008. Goolsby did not file any description of Kirkland's and Kong's credentials until August 19, 2008. See Fed. R. Civ. P. 26(a)(2)(B). The district court did not abuse its discretion in concluding Goolsby failed to offer proper expert testimony in this case.

Without expert testimony, Goolsby cannot prove the Defendants acted outside the legally-required standard of care and thus cannot establish a required element of his claim, and the district court properly granted summary judgment to the Defendants.

### 3. Goolsby's Summary Judgment Motion

For a plaintiff to succeed on a summary judgment motion, he "must demonstrate that on all essential elements of [his] case on which [he] bears the burden of proof at trial, [that] no reasonable jury could find for the non-moving party." Irby v. Bittick, 44 F.3d 949, 953 (11th Cir. 1995) (internal quotations omitted). For the same reasons discussed above that Goolsby cannot show a

conducted prior to the close of discovery. Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified." N.D. Ga. R. 26.2C.

genuine issue of material fact as to the Defendants' summary judgment motion, Goolsby also cannot prove all required elements of his case and is not entitled to summary judgment.

In conclusion, we affirm the district court's orders dated July 14, 2008, October 20, 2008, and December 5, 2008.

**AFFIRMED.**